UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY STAFFING ALLIANCE, NEW JERSEY BUSINESS and INDUSTRY ASSOCIATION and AMERICAN STAFFING ASSOCIATION,<br><br>             Plaintiffs,<br><br>v.<br><br>STATE OF NEW JERSEY, ROBERT ASARO-ANGELO, COMMISSIONER OF LABOR AND WORKFORCE DEVELOPMENT, NEW JERSEY DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT, CARI FAIS, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY, NEW JERSEY DIVISION OF CONSUMER AFFAIRS IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY,<br><br>             Defendants. | Civil Action No. |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
ORDER TO SHOW CAUSE FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

JAVERBAUM WURGAFT HICKS KAHN
WIKSTROM & SININS, P.C.
505 Morris Avenue, Suite 200
Springfield, NJ 07081
Tel #: 973-379-4200
Fax #: 973-379-7872
Attorneys for Plaintiffs New Jersey Staffing
Alliance, New Jersey Business and Industry
Association and American Staffing Association

*Of Counsel and On the Brief:*
Steven B. Harz, Esq. I.D. #: 006921977
David L. Menzel, Esq. I.D. #: 003571973
Rubin M. Sinins, Esq. I.D. #: 046701994

# TABLE OF CONTENTS

**BRIEF**                                                                                 **PAGE**

TABLE OF CONTENTS ................................................................................-i-

TABLE OF CITATIONS ..............................................................................-ii-

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ...........................................................................4

POINT I
     PLAINTIFFS HAVE SATISFIED THE STANDARD FOR A
     TEMPORARY RESTRAINING ORDER AND A PRELIMINARY
     INJUNCTION ..................................................................................13

     Probability of Success on the Merits ...........................................14

     Irreparable harm ...........................................................................14

     Harm to Others.............................................................................14

     Public Interest...............................................................................15

     Waiver of a Bond..........................................................................15

POINT II
     N.J.S.A. 34:8D-1 ET SEQ. VIOLATES THE DORMANT
     COMMERCE CLAUSE..................................................................17

POINT III
     N.J.S.A.§38:8D-7 IS UNCONSTITUTIONALLY VAGUE ........21

POINT IV
     N.J.S.A. 34:8D-1 et seq IS UNCONSTITUTIONAL BECAUSE IT IS AN
     UNREASONABLE EXERCISE OF POLICE POWER ..............23

POINT V
     THE LEGISLATION VIOLATES PLAINTIFFS' RIGHTS TO EQUAL
     PROTECTION OF LAWS ............................................................25

CONCLUSION ............................................................................................26

## TABLE OF CITATIONS

**CASES CITED**                                                                                                                        **PAGE**

A.L.K Corp. v. Columbia Pictures Industries, Inc.,
    440 F.2d 761 (3rd Cir. 1971)..............................................................................................14

Americans for Prosperity v. Grewal,
    No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793,
    at *63-64 (D.N.J. Oct. 2, 2019).......................................................................................17

Bass River Assoc. v. Mayor of Bass River Twp.,
    573 F. Supp. 205, 213 (D.N.J. 1983),
    aff'd 743 F.2d 159 (3rd Cir. 1984)
    aff'd 743 F.2d 159 (3rd Cir. 1984)..................................................................................24

Brown-Forman Distillers Corp. v. New York Liquor Authority,
    476 U.S. 573 (1986).................................................................................................18,19

Checker Cab Phila. vs. Phila. Parking Auth.,
    308 F. Supp. 3d 710 (E.D.Pa. 2018)...............................................................................25

Connally v. General Construction Co.,
    269 U.S. 365 (1925)........................................................................................................21

Continental Group, Inc. v. Amoco Chemicals Corp.,
    614 F.2d 351 (3rd Cir. 1980)..........................................................................................14

Daily v. City of Philadelphia,
    417 F. Supp. 3rd 597 (ED.Pa. 2019)
    aff'd 819 Fed. Appx. 71 (3rd Cir. 2020).........................................................................22

Delaware River Port Authority v. Transamerican Trailer Transport Inc.,
    501 F.2d 917 (3rd Cir. 1974)..........................................................................................14

Guidi v. Atlantic City,
    286 N.J. Super. 243 (App. Div. 1996) ...........................................................................22

Gardner v. N.J. Pinelands Comm.,
    125 N.J. 193, 221 (1991) ...............................................................................................24

Gilliam v. United States Dep't of Agric.,
    486 F. Supp. 3d 856 (E.D. Pa. 2020)..............................................................................15

Goldblatt v. Hempstead,
    369 U.S. 590, 594 (1963)................................................................................................24

Healy v. Beer Institute,
    491 U.S. 324 (1989)........................................................................................................19

Koons v. Reynolds,
    2023 U.S. Dist. LEXIS 3293, *63-*64 (D.N.J. 2023) (Seventh Amendment)............14

Lawton v. Steele,
    152 U.S. 133, 137 (1894)...................................................................................24

Lewis v. Harris,
    188 N.J. 415 (2006) ..........................................................................................25

Marland v. Trump,
    498 F.Supp. 3d 624 (E.D. Pa. 2020 ..................................................................16

Marshall v. Amuso,
    571 F. Supp. 3d 412, 429-30 (E.D. Pa. 2021)....................................................16

Mech. Contrs. Asso'n of NJ v. New Jersey,
    541 F.Supp. 3rd 477 (B.N.J. 2021) ...................................................................20

PharMethod, Inc. v. Caserta,
    382 F. App'x 214, 221-22 (3d Cir. 2010) ...........................................................16

Pike v. Bruce Church,
    397 U.S. 137 (1970)...........................................................................................18

San Fillipo v. Bongiovanni,
    961 F.2d 1125 (3rd Cir. 1992)
    cert. den. 506 U.S. 908 (1992) ..........................................................................21

Scanvec Amiable Ltd. v. Chang,
    80 F. App'x 171 (3d Cir. 2003) .........................................................................16

Small v. Warren,
    No. 15-8886, 2018 U.S. Dist. LEXIS 175876,
    at *9 n.3 (D.N.J. Oct. 12, 2018 ........................................................................17

Stilp v. Contino,
    613 F.3d 405 (3rd Cir. 2010)............................................................................ 14

Temple Univ. v. White,
    941 F. 2d. 201, 219-220 (3d Cir. 1991)..........................................................15,16

TitleMax of Delaware, Inc. v. Weismann,
    24 F.4th 230 (3rd Cir. 2021) .......................................................................18,19,20

Zambelli Fireworks Mfg. Co. v. Wood,
    592 F.3d 412, 426 (3d Cir. 2010) ......................................................................16

## STATUTES CITED                                                              PAGE

N.J.S.A. 34:8D-1 ...................................................................................................1,4,17,21
N.J.S.A. 34:8D-1,-2,-4 to -09,-11 to -13...............................................................4
N.J.S.A. 34:8D-2 ...........................................................................................................5
N.J.S.A. 34:8D-3,-10) ...................................................................................................4
N.J.S.A. 34:8D-3(a)(10-(11) .......................................................................................6
N.J.S.A. 34:8D-3(d) ......................................................................................................6
N.J.S.A. 34:8D-4 ...........................................................................................................7
N.J.S.A. 34:4D-5 ...........................................................................................................7
N.J.S.A. 34:8D-6 ...........................................................................................................7
N.J.S.A. 34:8D-7 ...............................................................................................8,17,21,23
N.J.S.A. 34:8D-7(a)(1) .................................................................................................8
N.J.S.A. 34:8D-7(b) ..................................................................................................1,22
42 U.S.C. § 1983 ...........................................................................................................5


## CONSTITUTIONS AND PROVISIONS CITED

United States Constitution....................................................................................2,3,4,5,25
Dormant Commerce Clause .............................................................................3,5,17,18,19
Privileges and Immunities Clause ..............................................................................5
14th Amendment .................................................................................................3,4,5,25
New Jersey Constitution .........................................................................................4,5,25
Article 1, Paragraph 1 ...................................................................................................25


## RULES CITED                                                                 PAGE

Fed. R. Civ. P65....................................................................................................15
Fed. R. Civ. P65(c) ...............................................................................................15

## PRELIMINARY STATEMENT

New Jersey has decided that the labor rights of temporary workers must be further protected. Yet this commendable goal has resulted in recently-enacted, unconstitutional laws which, if permitted to become effective, threaten the temporary staffing industry in New Jersey. Indeed, New Jersey has declared war on temporary staffing firms, imposing unique hurdles which must be vaulted by both New Jersey companies and out of state, third-party clients. New Jersey has thus overstepped its legitimate means to protect workers in a single industry and has burdened its own businesses, out of state companies and interstate commerce.  What is more, the remedy does not even serve the goal. Workers are not better protected under this Legislation. The third-party clients may sidestep and nullify the very pay provisions supposedly designed to increase wages. The paradoxical result shall be less protection for permanent and temporary workers.

In an extraordinary move, New Jersey is attempting to remake the operations of the temporary staffing industry by virtue of the passage of N.J.S.A. 34:8D-1 *et seq.* (the "Legislation"). But, in doing so, New Jersey has far exceeded the legitimate bounds of its police power. Perhaps most egregiously, under the Legislation, temporary laborers assigned to work at third-party clients must be paid no less than "the average rate of pay and average cost of benefits, or the cash equivalent thereof," of the third-party employees performing similar work. N.J.S.A. 34:8D-7(b). How that can be discerned or accomplished is not defined or explained. The entire staffing industry and their clients are at risk of violating these vague and indecipherable terms. Nor are these requirements even enforceable. Third-party clients may avoid the law altogether, even if the law could

1

somehow be understood and enforced. For example, third-party clients could only utilize temporary laborers and thus not have comparable employees to set the bar for average wage.

For a variety of reasons the Court should enjoin the operation of the Legislation because of several constitutional infirmities which render the Legislation both unlawful and unworkable. The Legislation discriminates against interstate commerce. The United States Supreme Court has uniformly held that the U.S. Constitution grants to the U.S. Congress the exclusive regulation of interstate commerce. No state can discriminate against interstate commerce. Yet New Jersey has done just that here by fundamentally straightjacketing the staffing industry. New Jersey has unconstitutionally required out of state businesses – defined broadly as "third-party clients" - to operate in a certain manner by mandating pay, record-keeping, record-providing and placement fee restrictions upon staffing firms doing business with out of state clients. For the staffing firms to abide these restrictions, their clients must also abide. "Third-party client" is defined as "any person who contracts with a temporary help service firm for obtaining laborers in a designated classification placement."

Thus, New Jersey staffing companies which send employees to states such as Pennsylvania or New York must compel those third-party clients to adopt New Jersey requirements. Under the Legislation, out of state clients must pay specified placement fees, maintain record-keeping requirements per the Legislation and share wage and benefits information. These requirements compel businesses outside of New Jersey to

operate a certain way. This unequivocally violates the Dormant Commerce Clause. These provisions are also -- as discussed herein -- unworkable and unenforceable.

The Legislation further violates the Due Process Clause of the 14th Amendment of the U.S. Constitution by means of its vagueness and its unlawful exercise of the police power. The Legislation contains pay provision which are impossible to discern and to implement. As noted, the Legislation mandates that staffing companies pay employees no less than the average wages and benefits, or their monetary equivalent, of similar employees of the third-party client. But such similarity is not defined. Nor is the basis of benefits or monetary equivalent defined. What about third-party clients who do not employ -- or who terminate -- employees of similar employment and utilize only temporary staffing employees? Where is the comparative information for pay and for benefits? The Legislation provides no answer.

This is an unlawful exercise of the police power also by virtue of the arbitrary means of remedy. The Preamble to the Legislation asserts that temporary help service firm workers earn 41% less than workers in traditional arrangements. But the Legislation does not provide a remedy guaranteeing a higher wage. The readily apparent self-help remedy for third-party clients is to ignore the pay requirements by terminating similarly-situated workers. This predictable result shall turn the Legislation's intended result on its head and lead to greater unemployment. The arbitrariness of the Legislation is manifest. New Jersey could have established a higher minimum wage for workers, but it did not do so. The "remedy" utilized here does not utilize means precisely drawn to further the legislative purpose. It serves the opposite purpose.

3

What is more, the 14th Amendment to the U.S. Constitution and the New Jersey Constitution mandate that individuals in similar situations be treated equally under the law. The Legislation violates this principle as well. The employees covered by the Legislation as "designated classification placements" include 10 U.S. Department of Labor classifications covering all staffing industry employees. Yet in no other industry – other than the staffing industry - do employers with employees in these very classifications have to meet the pay requirements mandated here. In no other industry must employers match the average wages and benefits of third-party clients.

<u>STATEMENT OF FACTS</u>

This action seeks a declaration of unconstitutionality and a permanent injunction prohibiting enforcement of the Legislation, N.J.S.A. 34:8D-1 *et seq.* (the "Legislation") purporting to protect the labor rights of temporary workers. The Legislation was enacted on February 6, 2023 and its respective provisions shall become effective on May 7 (N.J.S.A. 34:8D-3,-10) and on August 5, 2023 (N.J.S.A. 34:8D-1, -2, -4 to -09, -11 to -13). Barring this relief, Plaintiffs contend that the temporary staffing industry of the State of New Jersey is at risk of failure. Such an economic result would paradoxically harm the very workers the Legislation seeks to help.

Plaintiffs New Jersey Staffing Alliance, New Jersey Business and Industry Association and the American Staffing Association, are organizations dedicated, respectively, to promote the staffing industry and its members, together with the promotion of New Jersey businesses. Defendants are the State of New Jersey, the Commissioner of Labor and Workforce Development, and the Acting Director of the

4

Division of Consumer Affairs in the Department of Law and Public Safety, the public officials charged with implementing and enforcing the Legislation, along with the agencies they lead.

The Complaint asserts that the Legislation violates the U.S. Constitution in several respects: the Dormant Commerce Clause, the Privileges and Immunities Clause, the Due Process clause of the 14th Amendment (due to vagueness and unlawful exercise of police power), and the Equal Protection clause of the 14th Amendment. The Complaint further asserts violations of the New Jersey Constitution and asserts causes of action under 42 U.S.C. § 1983 and related statutes together with the New Jersey Civil Rights Act.

The Legislation defines a "temporary laborer" as "a person who contracts for employment in a designated classification placement with a temporary help service firm." N.J.S.A. 34:8D-2. The term "temporary help service firm" is defined as a business employing individuals for the purpose of assigning them to firms, and who pay social security taxes, federal and state unemployment insurance, and carry workers' compensation insurance. Ibid. The definition includes persons or entities outside the State of New Jersey.

A "third-party client" is one who contracts with a temporary help service firm to obtain temporary laborers in a "designated classification placement," Ibid. The terms "temporary laborer" and "third-party client" include individuals employed by a New Jersey temporary help service firm provided to an out of state third-party client, or temporary laborers provided by an out of state temporary help service provider to a New Jersey third-party client.

5

The Legislation defines "designated classification placement" as an assignment of a temporary worker to perform work in identified occupational categories. Ibid. Plaintiffs' members include designated classification placements. The Legislation imposes on temporary help service firms sending temporary laborers in designated classifications, to supply information related to the identity of the temporary laborer; the temporary help service firm; its workers' compensation carrier; the work site employer or third-party client and Department of Labor and Workforce Development; the name and nature of the work to be performed; the wages offered the worksite details and address; details regarding the position and any special clothing or protective gear and/or training required; the schedule and length of assignment; and sick leave. N.J.S.A. 34:8D-3(a)(10)-(11). Violations of these requirements carry civil penalties of between $500 to $1,000 for each violation. N.J.S.A. 34:8D-3(d).

Another section of the Legislation imposes record keeping requirements upon temporary help service firms. These requirements include: (1) information related to the third-party client and each work-site and the date of the transaction; (2) the name, address and specific location sent to work, the type of work performed, the number of hours worked, the hourly rate of pay and the date sent. (Information required by this sub-subsection is required to be sent by the third-party client to the temporary help provider no later than seven days after the last day of work); (3) the name and address of the individual at each third-party client's place of business responsible for the transaction; (4) any special qualifications or attributes requested by each third-party client; (5) copies of contracts with the third-party client; (6) copies of notices required by subsection 3(a); and

6

(7) details regarding deductions.  The same Section requires records be kept for 6 years. Violation of the subsection subjects the temporary help service firm and the third-party client to a penalty. N.J.S.A. 34:8D-4.

N.J.S.A. 34:4D-5 precludes a temporary help service or a third-party client from charging a temporary laborer for transportation to the work site.

N.J.S.A. 34:8D-6 requires a temporary help service firm provide a temporary laborer certain information at the time of payment of wages.  The same Section requires that the third-party client, at the end of the work day, provide the temporary laborer a verification form with required information, including the company worker's name, work location, and hours worked.  Failure to comply carries a civil penalty for each violation.

Subsection (b) of N.J.S.A. 34:8D-6 prohibits a third-party client from withholding or diverting wages, for any person, except as authorized by the section.

Subsection (g) of N.J.S.A. 34:8D-6 requires a temporary help service firm to pay a temporary worker for four hours work if the worker is contracted to work at a third-party client's work site but is not utilized by the third-party client or, a minimum of two hours if the temporary laborer is sent to another location.

Subsection (h) requires a third-party client to reimburse a temporary help service firm the wages and related payroll taxes by a temporary laborer in accordance with payment hours outlined in invoices, service agreements or stated terms.  Failure to do so subjects the third-party client to penalties.

7

N.J.S.A. 34:8D-7(a)(1) restricts the amount of a placement fee a temporary help service firm may charge a third-party client which offers a permanent position to a temporary laborer.

Pursuant to Subsection (b) or N.J.S.A. 34:8D-7:

Any temporary laborer assigned to work at a third-party client in a designated classification placement shall not be paid less than the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third-party client performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions for the third-party client at the time the temporary laborer is assigned to work at the third-party client. Each violation of this subsection for each affected temporary laborer shall constitute a separate violation under section 11 of P.L. 2023, c.10 (C.34:8D-11).

Section (c) imposes a $5,000 civil penalty for violation of Section 7. Subsection (d) makes the third-party client jointly and severally liable for the violation.

The temporary staffing industry services a significant segment of the United States economy and services a wide array of businesses and industries. The staffing industry is a significant component to the United States economy. The staffing industry nationwide has provided job opportunities for about 16 million employees per year pre-pandemic and approximately 13.6 million employees during the pandemic. Approximately 3 million temporary and contract employees work for American staffing companies during an average week. During the course of a year, American staffing companies hire 16 million temporary and contract employees.

Approximately seventy-three percent (73%) of temporary staffing employees work in one or more locations of third-party clients on a full-time basis, which is

comparable to the overall United States workforce of seventy-five percent (75%) full-time employees. More than six in ten staffing employees (64%) work in the staffing industry to fill in the gap between jobs or to help them land a job. Furthermore, one in five (20%) of staffing employees cite scheduling flexibility as the reason choosing temporary/contract work.

Staffing employees work in virtually all occupations and industries. Temporary staffing employees work as follows:

- 36% industrial

- 24% office/clerical and administrative

- 21% professional/managerial

- 11% engineering, information technology and scientific

- 8% healthcare

Temporary staffing companies provide temporary employees to third-party clients to service the needs of those third-party clients. Third-party clients often need short-term labor on short notice to complete a project, and they may lack the necessary time and manpower to interview, hire and complete the administrative paperwork to secure new employees. Staffing companies fill this void by providing temporary laborers that the staffing companies have already recruited and vetted, and for whom the staffing companies complete all the required paperwork, administration and human resources functions.

Without the assistance of staffing companies and the laborers they provide, many third-party clients (particularly small ones), could not economically compete in the

marketplace. Temporary staffing companies have responsibility for addressing all administrative matters, such as paying the workers' wages, obtaining and maintaining appropriate Workers' Compensation Insurance, attending to unemployment insurance obligations, performing payroll services, and withholding and paying all applicable taxes.

The third-party client determines the workers' daily work hours and their specific job duties. Temporary staffing companies charge third-party clients for their services by submitting an invoice. The invoice covers the staffing companies' costs of finding, recruiting and vetting the employees, in addition to taking care of all employer obligations such as paying the employees' wages and related taxes, providing workers' compensation and unemployment insurance, the general and administrative expenses of operating its business, plus a profit element.

Third-party clients are willing to pay the staffing companies in return for the flexibility of obtaining labor only as needed and to avoid the administrative burden of recruiting and hiring workers to their own payroll when the worker may be employed on a project for only a few days.

The temporary staffing industry provides a significant employment contribution to the workplace in the State of New Jersey. Temporary staffing companies employed over 510,000 workers in New Jersey in 2021. The highest temporary help occupation groups in New Jersey have been transportation and material moving (38%), office and administrative support (14%), production (10%), healthcare practitioners and technical (7%) and business and financial operations (6%).

The Legislation contains significant and oppressive provisions, including record-keeping requirements, record producing requirements, pay requirements and placement fee limitations that will force financial and administrative unconstitutional burdens on every staffing agency in New Jersey.  The Legislation requires that temporary staffing employees be paid the average pay and benefits or monetary equivalent of similarly situated employees of the third-party clients.

While there are many provisions in the legislation that create significant difficulties, the latter provision at the outset creates the most egregious impact. The amount of time and labor that will be spent with regard to compliance with this provision will in all probability be cost prohibitive and ultimately destroy the temporary staffing industry in New Jersey. There are so many factors that make section 7.b. so problematic. For one, computation of the amount to be paid to the temporary staffing employee is impossible to accurately calculate.  Section 7.b. provides, "Any temporary worker assigned to work at a third-party client in a designated classification placement shall not be paid less than the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third-party client performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions for the third-party client at the time the temporary laborer is assigned to work at the third-party client."

This provision in and of itself can bring the temporary staffing industry here in New Jersey to a halt. First, this provision requires and assumes significant cooperation to

11

be voluntarily provided by the third-party client, and this provision assumes that the third-party client is willing to share its pay scale information with the temporary staffing agency. Those assumptions are not accurate. The Legislation also does not address the situation where there are no comparable workers at the third-party client.

Second, there is no guidance whatsoever for determining whether work is the same or substantially similar to the work performed by the employees of the third-party client. To enable temporary service firms to make such a determination, there must be specific criteria for assessing whether the temporary job requires "equal skill, effort, and responsibility" as the job being performed by the client's employee and whether the job is "performed under similar working conditions." Such determinations are inherently subjective.

The Legislation lists three characteristics of temporary laborers necessary for pay calculations: skill, effort and responsibility. But how is each of these factors to be defined and evaluated? The Legislation provides no answer. Plus, how does one mix and match the various factors when comparing laborers? Again, the Legislation provides no answer. It is an impossible task to interpret and to implement the Legislation's pay provisions. Temporary service providers and third-party clients face enormous financial risk to run afoul of these vague and impossible provisions.

Third, there is no consideration for pay and benefits based on length of service. There can be some long-term assignments which are often the result of a mutual decision by both the individual and the third-party client. With long-term assignments both the staffing firm and the third-party client generally will agree to issue pay rate increases

12

periodically to these temporary laborers to encourage retention of this temporary laborer. There is no accountability for this scenario in this Legislation.

Fourth, the Legislation requires the temporary worker to be paid the same average pay plus benefits of a third-party client employee with the same length of time in the job. There is no clear definition regarding what is meant by "benefits provided to the clients' employees". There is no direction to advise if benefits include voluntary benefit plans as well as benefit plans whose costs are shared by the third-party client's employee and the third-party client. Also, the Legislation does not provide for any factors to determine whether a job is the same or substantially similar and factors that would allow pay and benefits differentials based on differing working conditions. For example, there is no consideration for factors such as seniority, merit, quantity or quality of production, workplace location, travel, education, training, and experience. Furthermore there is no consideration for whether the work is performed on weekends, holidays or what time of day.

POINT I

**PLAINTIFFS HAVE SATISFIED THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION.**

F.R. Civ. Pro. 65 governs applications for preliminary injunctive relief. The Third Circuit has consistently stated the standard for preliminary injunctive relief:

(1)     a reasonable probability of eventual success on the merits;

(2)     whether the applicant will be irreparably harmed if relief is not granted;

13

(3)    the possibility of harm to other interested parties from the granting or denial of the preliminary injunction; and

(4)    the public interest.

Delaware River Port Authority v. Transamerican Trailer Transport Inc., 501 F.2d 917, 919-920 (3rd Cir. 1974), quoting A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3rd Cir. 1971); Stilp v. Contino, 613 F.3d 405, 409 (3rd Cir. 2010); Continental Group Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 356-357 (3rd Cir. 1980).

Probability of Success on the Merits

The Plaintiffs' probability of success on the merits is addressed in the legal argument which follows in Point II through V.

Irreparable Harm

Courts usually, though not invariably, find irreparable harm where a preliminary injunction is sought in the context of a constitutional challenge. Stilp v. Contino, supra, 813 F.3rd at 409) (First Amendment) Koons v. Reynolds, 2023 U.S. Dist. LEXIS 3293, *63-*64 (D.N.J. 2023) (Second Amendment).

Moreover, the costs to Plaintiffs, and to their members, assuming the Plaintiffs are able to comply with the Legislation, would be difficult if not impossible to calculate.

Harm to Others

The preliminary injunction only seeks to maintain the status quo. No person or entity will be harmed by the issuance of a preliminary injunction.

14

Public Interest

Since this action challenges the constitutional validity of a state statute, the action, by definition, presents issues of public importance.

Moreover, given the importance of the temporary staffing industry to the State's economy, and the impact of the Legislation upon temporary service providers and their clients, the public interest is evident.

Waiver of a Bond

Federal Rule of Civil Procedure 65(c) states that a Court may only grant a preliminary injunction if the movant posts security in an amount "that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Pro. 65(c). However, courts have the discretion to waive this requirement in the proper circumstances.

The Third Circuit has acknowledged that "there may be instances in which a strict reading of Rule 65(c) would be inappropriate." Temple Univ. v. White, 941 F.2d 201, 219 (3d Cir. 1991). The Court in Temple Univ. found that when posting a bond would impose a burden on the movant that outweighs any "possible loss to the enjoined party" and when movants seek "to enforce important federal rights or public interests, arising out of comprehensive . . . welfare statutes," the bond can be waived. Id. at 220; see also, Gilliam v. United States Dep't of Agric., 486 F. Supp. 3d 856, 882 (E.D. Pa. 2020)(no bond required when plaintiffs challenged United States Department of Agriculture interpretation of a statute providing SNAP benefits during the public health crisis).

15

Because the purpose of the bond is to protect a defendant against monetary loss if an injunction is wrongfully granted, in a non-commercial matter the Court should consider whether the defendant will suffer any financial loss. Temple Univ. v. White, 941 F. 2d. 201, 219-220 (3d Cir. 1991). The Court must balance the relative hardships to the parties, i.e., the hardship that the bond requirement would impose on the movant versus the potential loss to the defendant. Temple Univ., 941 F.2d at 219-220; PharMethod, Inc. v. Caserta, 382 F. App'x 214, 221-22 (3d Cir. 2010); Scanvec Amiable Ltd. v. Chang, 80 F. App'x 171, 175 (3d Cir. 2003). When there is no risk of monetary loss to the defendant, the bond can be waived. Temple Univ., 941 F.2d at 219-220; , see also, Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010); Phar Method, Inc. v. Caserta, supra, 382 F. App'x at 221-22.

In Marland v. Trump, 498 F.Supp.3d 624 (E.D. Pa. 2020), plaintiffs sought to enjoin an Executive Order that placed limitations on the streaming platform, Tik Tok. The Court waived the requirement of a bond because it found that "[t]he Government does not suggest that it will suffer monetary harm stemming from this preliminary injunction, and imposition of anything greater than a nominal bond could constitute a substantial hardship for Plaintiffs. Moreover, as noted, Plaintiffs seek to further the public interest by enjoining unlawful agency action." Id., at 644-645; see also, Marshall v. Amuso, 571 F. Supp. 3d 412, 429-30 (E.D. Pa. 2021)(court waived bond because plaintiffs sought injunction against school board policy they claimed restricted free speech, which injunction did not pose monetary risk to district but did implicate an important federal right).

The New Jersey District Court also has declined to require a bond where the injunction posed little financial risk to the defendant and the plaintiff sought to enforce a federal right. Small v. Warren, No. 15-8886, 2018 U.S. Dist. LEXIS 175876, at *9 n.3 (D.N.J. Oct. 12, 2018) (court waived bond where plaintiff prisoner sought injunction requiring Department of Corrections to provide him with additional medical supplies); Americans for Prosperity v. Grewal, No. 3:19-cv-14228-BRM-LHG, 2019 U.S. Dist. LEXIS 170793, at *63-64 (D.N.J. Oct. 2, 2019)(bond waived where plaintiffs sought preliminary injunction of New Jersey Senate Bill requiring disclosure of certain political donations and communications).

Because Plaintiffs seek to enforce their constitutional rights and defendant will not suffer a monetary loss by imposition of an injunction, Plaintiffs respectfully request that the Court waive the requirement that plaintiff post a bond.

**POINT II**

### N.J.S.A. 34:8D-1 ET SEQ. VIOLATES THE DORMANT COMMERCE CLAUSE.

Several sections of N.J.S.A. 34:8D-1 et seq. strongly impact out of state temporary service providers who provide temporary laborers to a New Jersey work sites, e.g., requirements regarding record generation, maintenance; requirements regarding provision of information to temporary laborers; requirements regarding transportation; requirements relating to placement fees; and requirements regarding rate of pay.

Similarly, the Legislation has requirements which would apply to an out of state, third-party client that is serviced by a New Jersey temporary staffing provider, e.g.,

17

record generation and maintenance.   The Legislation's pay requirements require a temporary service provider to calculate the rate of pay for a temporary laborer (assuming it is able to do so) N.J.S.A. 34:8D-7.  As such, the out of state third-party client would have to identify similar workers, and calculate the average compensation and value of benefits, and provide information to the temporary help service provider, assuming it is willing and able to do so.  This burdens an out of state client.

The United States Constitution, Article I, Paragraph 1, Clause 3 (the Commerce Clause) bestows upon the U.S. Congress the power to regulate commerce among the states.  The Dormant Commerce Clause is a corollary to the Commerce Clause; it is a limitation on a State's ability to enact Legislation which affects interstate commerce. TitleMax of Delaware, Inc. v. Weismann, 24 F.4th 230, 237-238 (3rd Cir. 2021).  State legislative attempts to directly regulate or discriminate against interstate commerce are regularly struck down.  Ibid., citing Brown-Forman Distillers Corp. v. New York Liquor Authority, 476 U.S. 573, 579 (1986).

In Pike v. Bruce Church, 397 U.S. 137 (1970), an Arizona cantaloupe grower challenged an Arizona statute which required that cantaloupes grown in Arizona be packed a certain way.  Packing cantaloupes in the prescribed fashion required a packing shed, which the grower did not have at its Arizona site.  The grower had a packing shed nearby in California.  It bulk shipped the cantaloupes to the California site where the cantaloupes were packaged for distribution.  The grower was cited for violation of the Arizona statute.

18

The statute at issue did not on its face reflect a legislative intent to regulate or discriminate against interstate commerce. Further, the Court recognized that Arizona had a legitimate interest in the packaging of and promotion of Arizona cantaloupes. Even under those circumstances, and even though the case involved but a single grower with presumably unique circumstances, and even though the cantaloupe was grown in and initially shipped from Arizona, the Court ruled the statute was unconstitutional: "The State's tenuous interest in having the company's Arizona cantaloupe identified as originally in Arizona cannot constitutionally justify that the company build and operate" facilities in the State. Id. at 145.

Brown-Forman, supra, involved New York legislation which affected pricing in other states. The Supreme Court found that the Legislation violated the Commerce Clause. Legislation which affects out of state pricing is routinely held to violate the Commerce Clause. See e.g., Healy v. Beer Institute, 491 U.S. 324 (1989). To the extent the Legislation sets the requirements for a Pennsylvania third-party client receiving temporary laborers from a New Jersey temporary help service firm, it violates the Commerce Clause. To the extent the Legislation fixes the amount of a placement fee in an interstate transaction, it is unconstitutional.

In TitleMax, supra, the Court recognized that one way a challenged statute can "directly regulate" interstate commerce "is if the statute has extra territorial effects that adversely affect economic production (and hence interstate commerce in other states)". Id. 24 F.4th at 238. Such laws are unconstitutional.

Applying this standard, the Legislation is clearly unconstitutional because the Legislation impacts the economic production of out of state entities.

TitleMax involved a Pennsylvania usury statute.  The lender was out of state, and the loans were closed at the lender's out of state locations.  The borrowers were in Pennsylvania.  Because the loan transactions had an in state component, the Third Circuit applied a different test to determine whether there was an impermissible interference with interstate commerce:

> Having determined that TitleMax's conduct does not occur wholly outside of Pennsylvania, we must determine whether the burdens [from the state law being applied] on interstate commerce substantially outweigh the putative local benefits ...

Id., at 240, internal citations omitted.

See also Mech. Contrs. Asso'n of NJ v. New Jersey, 541 F.Supp. 3rd 477, 494 (D.N.J. 2021).

In TitleMax, the Court was influenced by the transactions' contacts with Pennsylvania which were very substantial: auto loans were made to Pennsylvanians; the security was located in Pennsylvania; the lender's liens were recorded in Pennsylvania; loan payments were made from Pennsylvania; collection efforts were made in Pennsylvania; and any re-possessions occurred in Pennsylvania.

By contrast, in the case of a New Jersey temporary service provider providing temporary laborers to out of state, third-party clients, the transactions are more firmly rooted out of state.  The third-party client is located there; the third-party client must satisfy all of the Legislation's third-party client requirements because of the broad third-

20

party client definition.  The Legislation's interstate burden on the temporary service
provider and third-party client is heavy: including record generation, maintenance and
provision; transportations; payment, and placement fee requirements.

Even applying a balancing test, the interest of New Jersey in protecting temporary
laborers is slight compared to the extra territorial burdens which the Legislation places
on an out of state entity. The Legislation unduly burdens interstate commerce.

## POINT III

### N.J.S.A. §38:8D-7 IS UNCONSTITUTIONALLY VAGUE

The "void for vagueness" doctrine is rooted in the Due Process protection in the
Fourteenth Amendment to the United States Constitution.  San Fillipo v. Bonglovanni,
961 F.2d 1125, 1135 (3rd Cir. 1992) cert. den. 506 U.S. 908 (1992).

As noted by the Court in San Fillipo,

The doctrine is based on the idea of fairness.  Its purpose is only to give "fair
warning" of prohibited conduct.

. . . The relevant inquiry is whether the statute or standard is

> "sufficiently explicit to inform those who are subject to it what
> conduct on their part will render them liable to its penalties . . .
> consonant with ordinary notions of fair play and the settled rules of
> law.  And a statute which either forbids or requires the doing of an
> act in terms so vague that men if common intelligence must
> necessarily guess at its meaning and differ as to its application
> violates the first essential offense process of law".

Id. at 1135-1136; internal citations omitted; quoting Connally v. General Construction Co.,
269 U.S. 365, 391 (1925).

21

The "void for vagueness" doctrine was addressed by a district court in the Third Circuit in <u>Daily v. City of Philadelphia</u>, 417 F. Supp. 3rd 597 (E.D.Pa. 2019) <u>aff'd</u> 819 Fed. Appx. 71 (3rd Cir. 2020), where the court noted two different standards for void for vagueness, "facial" and "as applied". The "facial" standard applies when there exists no set of circumstances under which an act would be valid. The "as applied" standard is applied when an act is not unconstitutional, but is unconstitutional as applied to a particular person under a particular set of circumstances. <u>Id</u>. at 6:16, 617.

The court in <u>Daily</u> observed that the "void for vagueness" doctrine was intended to address two due process concerns; "first, that regulated parties know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discretionary way. <u>Id</u>. at 616. A statute is void if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessary guess as its meaning and differ as to its application...". <u>Ibid</u>.

New Jersey state courts also will decline to enforce an enactment which is vague: the ordinance is "vague because it does not give the person of reasonable intelligence a reasonable opportunity to know what is prohibited so that he can act accordingly" lead the reasonable person to realize that his or her conduct was a violation of the ordinance". <u>Guidi v. Atlantic City</u>, 286 N.J. Super. 243, 247 (App. Div. 1996).

In the instant case, not only persons of average intelligence, but experts in the field to which the Legislation applies, cannot ascertain the import of Section 7(b) of the Legislation which prescribes the rate of pay to temporary laborers, and conform their

conduct accordingly. Even assuming that clients can comprehend the Legislation, are able and willing to provide the necessary information to temporary staffing providers, the Legislation provides no guidance for determining whether work is the same or substantially similar, or how to assess equal skill, effort and responsibility, or similar working conditions. No consideration is given to longevity, or how to deal with pay increases, or guidance as to benefits, and the calculation of their value.

Section 7(b) provides no precision and no guidance. It is unconstitutionally void because of it is facially vague.[1]

### POINT IV

**N.J.S.A. 34:8D-1 et seq. IS UNCONSTITUTIONAL BECAUSE IT IS AN UNREASONABLE EXERCISE OF POLICE POWER.**

Undoubtedly, New Jersey may exercise its police powers to protect the interests of its temporary laborers. As plaintiffs have noted elsewhere, several states have enacted enhanced protections. No state, however, has done what New Jersey has done in adopting the Legislation.

Plaintiffs have noted the burdens the Legislation imposes on temporary staffing providers and their clients. The requirements of N.J.S.A. 34:8D-7 regarding the rate of pay and value of benefits are particularly problematic.

---

[1] Section 7(a) of the Legislation deals with the amount of placement fees that can be charged to a third-party client in the event a temporary employee is offered and accepts a permanent position. Because the amount of wages paid to the temporary employee is a component in the calculation of the placement fee, Section 7(a) also fails as being unconstitutionally vague.

Apart from the fact of the difficulty, if not impossibility, of making the rate of pay and value of benefits calculations, the temporary help service firms is wholly reliant on the willingness and ability of the third-party client to make the calculations and to provide same to the temporary help service firms.  Apart from the issues concerning the calculation, since the Legislation requires a rate of pay no less than the average rate of pay and value of benefits for the third-party clients' workers' performing similar work, it is inevitable that some temporary workers will be paid more than the third-party clients' full time employees.  Employers reward employees for loyalty and length of service.  The Legislation, if it can be implemented, produces an absurd result. This is unreasonable.

A state's police power is not unlimited.  Courts have not adopted specific criteria for determining whether or not an exercise of police power is proper.  Instead, the exercise must be "reasonable".  Goldblatt v. Hempstead, 369 U.S. 590, 594 (1963).  In Goldblatt, the Court noted that:

The classic statement of the rule in Lawton v. Steele, 152 U.S. 133, 137 (1894) is still valid today:

> To justify the State in ... interposing its authority on behalf of the public, it must appear, first, that the interests of the public . . . requires such interference, and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not concluding oppressive upon individuals.

See also Bass River Assoc. v. Mayor of Bass River Twp., 573 F. Supp. 205, 213 (D.N.J. 1983), aff'd 743 F.2d 159 (3rd Cir. 1984) aff'd 743 F.2d 159 (3rd Cir. 1984); Gardner v. N.J. Pinelands Comm., 125 N.J. 193, 221 (1991), Stein, J. concurring.

24

The Legislation is an unreasonable exercise of police powers, precluded by the Fourteenth Amendment, because of unreasonable burdens placed on temporary help service firms and their third-party clients to implement the Legislation, and the unreasonable result produced upon implementation.

### POINT V

### THE LEGISLATION VIOLATES PLAINTIFFS' RIGHTS TO EQUAL PROTECTION OF LAWS.

The 14th Amendment to the U.S. Constitution affords Plaintiffs "the equal protection of the laws".[2] Section 7 of the Legislation violates Plaintiffs' rights to equal protection because only the temporary placement industry is forced to be reliant on the ability and the willingness of their customers to make the calculations required by Section 7 in order to continue to operate. Moreover, other placement service industries do not have restrictions in the amount of placement fees charged customers. Only the temporary service industry is restricted in the amount of placement fees charged. There is no rational basis for this distinction.

Essentially, equal protection requires that all persons similarly situated be treated alike. Checker Cab Phila. vs. Phila. Parking Auth., 308 F. Supp. 3d 710, 731 (E.D.Pa. 2018).

Plaintiffs discern no rational basis to single out the temporary staffing industry with respect to making it wholly reliant on clients' willingness and ability to determine

---

[2] New Jersey's Constitution does not have express equal protection language in its Constitution. However, courts have read into Article 1, Paragraph 1 of the New Jersey Constitution, the right to equal protection. Lewis v. Harris, 188 N.J. 415 (2006).

rate of pay.  Further, Plaintiffs see no rational basis to single out the industry, among all types of placement services, with respect to the restrictions on placement fees.

## CONCLUSION

For the foregoing reasons and authorities, it is respectfully submitted that Plaintiffs' application for preliminary injunctive relief should be granted.

Respectfully submitted,

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.
Attorneys for New Jersey Staffing Alliance,
New Jersey Business and Industry Association
and American Staffing Association

By: _/s/ Steven B. Harz_____

DATED: May 5, 2023
                Steven B. Harz
                David L. Menzel
                Rubin M. Sinins