**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

NEW JERSEY STAFFING ALLIANCE,
*et al.*,

        Plaintiffs,

    v.

CARI FAIS, *Acting Director of the New
Jersey Division of Consumer Affairs in the
Department of Law & Public Safety*, *et al.*,

        Defendants.

No. 1:23-cv-02494

**OPINION**

<u>**APPEARANCES**</u>:

Steven B. Harz
David L. Menzel
Rubin M. Sinins
JAVERBAUM WURGAFT HICKS
  KAHN WIKSTROM & SININS, P.C.
505 Morris Avenue, Suite 200
Springfield, NJ 07081

    *On behalf of Plaintiffs.*

Matthew J. Platkin, *Attorney General*
Angela Cai, *Deputy Solicitor General*
Mayur P. Saxena, *Assistant Attorney General*
Jessica L. Palmer, *Deputy Attorney General*
Eve Weissman, *Deputy Attorney General*
Ashleigh Shelton, *Deputy Attorney General*
Mary Kenah, *Deputy Attorney General*
Nathaniel I. Levy, *Deputy Attorney General*
OFFICE OF THE ATTORNEY
  GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625-0112

    *On behalf of Defendants.*

**O'HEARN, District Judge.**

## <u>INTRODUCTION</u>

In February 2023, the State of New Jersey enacted novel and landmark legislation aimed at protecting a "particularly vulnerable" workforce from abusive labor practices: the Temporary Workers' Bill of Rights ("the Act"). N.J. STAT. ANN. § 34:8D-1, *et seq.* The Act imposes a variety of new requirements on both the companies who hire temporary workers and the staffing agencies who supply them. *See id.* These requirements include, among other things, certain information disclosures, mandates regarding compensation and benefits, and prohibitions of retaliation and wage diversion. *E.g.*, §§ 34:8D-3; 34:8D-7; 34:8D-10. New Jersey is the first State to enact such laws. Some portions of the law went into effect in May 2023; others take effect on August 5, 2023. *E.g.*, §§ 34:8D-10, 34:8D-7.

Now, Plaintiffs New Jersey Staffing Alliance ("NJSA"), New Jersey Business & Industry Association ("NJBIA"), and American Staffing Association ("ASA," and with NJSA and NJBIA, "Plaintiffs")—three industry groups whose members include those regulated by the Act—have brought this action challenging the Act's constitutionality, seeking a temporary restraining order and preliminary injunction (and, ultimately, a permanent injunction) precluding the Act's enforcement under the U.S. and New Jersey Constitutions and state and federal civil rights statutes. (ECF No. 1). The Court ordered Defendants Cari Fais, the Acting Director of the New Jersey Division of Consumer Affairs; Robert Asaro-Angelo, Commissioner of Labor & Workforce Development; the state agencies they lead; and the State of New Jersey (collectively, "Defendants") to show cause why such an injunction should not issue. (ECF No. 10). Defendants filed their opposition, to which Plaintiffs replied. (ECF Nos. 18–19). The Court heard oral argument pursuant to Local Rule 78.1 on June 13, 2023.

Having considered the parties' papers and oral arguments, for the reasons that follow, Plaintiffs' Motion is **DENIED**.

I.     <u>**BACKGROUND**</u>

    A.  **The Act**

New Jersey Governor Phil Murphy signed the Temporary Workers' Bill of Rights into law on February 6, 2023. *See Bill A1474 Aa w/GR (2R)*, N.J. LEG. (2022), https://www.njleg.state.nj.us/bill-search/2022/A1474. This marked the end of a long legislative process, which began with the Act's introduction in the New Jersey Assembly in January 2022, involved considerable lobbying efforts against it, nearly ended with Governor Murphy's conditional veto[1] in September 2022 before the New Jersey Legislature's concurrence, and culminated in its passage and enactment in February. *Id.*; (Decl. of Michele Siekerka, ECF No. 1-4, ¶ 8; Hr'g Tr., ECF No. 24 at 12:11–15).

The Act aims to "further protect the labor and employment rights of [temporary] workers," who number "at least 127,000 . . . in New Jersey" and who the Legislature found "are particularly vulnerable to abuse of their labor rights, including unpaid wages, failure to pay for all hours worked, minimum wage and overtime violations, unsafe working conditions, unlawful deductions from pay for meals, transportation, equipment, and other items, as well as discriminatory practices." §§ 34:8D-1(a), (c)–(d). The Legislature also acknowledged that "full-time temporary

---

[1]  An earlier version of the Act applied its terms to *all* temporary workers in New Jersey, but Governor Murphy conditionally vetoed that version in September 2022, recommending—among other things—that the Legislature tailor the bill to "those positions in the workforce at greatest risk of exploitation" in order to "ease the compliance burdens placed on the temporary help service industry, while ensuring that laborers in certain occupations subject to more extreme hardships receive due protection and consideration in enforcement." Conditional Veto Statement, A.1474 (First Reprint), N.J. LEG. 3 (Sept. 22, 2022), https://pub.njleg.state.nj.us/Bills/2022/A1500/1474_V1.PDF.

help service firm workers earn 41 percent less than workers in traditional work arrangements, and these workers are far less likely than other workers to receive employer-sponsored retirement and health benefits," and that "[r]ecent national data indicate that the share of Black and Latino temporary and staffing workers far outstrips their proportion of the workforce in general." § 34:8D-1(b).

In response to these problems, the Act provides temporary workers[2] a number of new protections, including the following:

- **Disclosure:** Temporary staffing agencies now must provide laborers covered by the Act with certain information about each job placement, including the nature of the work to be performed; the wages offered; whether any special clothing, equipment, or training is required or provided; and the schedule for and duration of the assignment. § 34:8D-3(a). Staffing agencies must also provide 48-hour notice of a change "in the schedule, shift, or location of an assignment . . . when possible." *Id.* Agencies further must inform workers of any "strike, lockout, or other labor dispute . . . and [of] the laborer's right to refuse [such] assignment." § 34:8D-3(b).

- **Recordkeeping:** Temporary staffing agencies must keep and maintain records related to all placement transactions, including "(1) information related to the third-party client and each worksite and the date of the transaction; (2) the name, address and specific location sent to work, the type of work performed, the number of hours worked, the hourly rate of pay and the date sent. . . . ; (3) the name and address of the individual at each third-party client's place of business responsible for the transaction; (4) any special qualifications or attributes requested by each third-party client; (5) copies of contracts with the third-party client; (6) copies of notices required by subsection 3(a); and (7) details regarding deductions." (Plas.' Br., ECF No. 1-2 at 6–7 (summarizing § 34:8D-4(a))). Agencies must keep these records for at least six years, and failure to do so, or failure by a third-party client to remit accurate information, could result in a civil monetary penalty. §§ 34:8D-4(b)–(c).

---

[2] Upon implementing the changes recommended by Governor Murphy's conditional veto, the protections have only been extended to a subset of the workers in the temporary staffing industry, namely those involved in the following sectors: (1) protective services, such as animal control, private investigation, and security; (2) food preparation, such as cooking, bartending, dishwashing, and serving; (3) building and grounds cleaning and maintenance, including pest control and landscaping; (4) personal care and services, such as hairdressers, attendants, bellhops, and childcare; (5) construction and related fields, such as carpentry, painting, electrical, and roofing; (6) installation, maintenance, and repair; (7) production, including manufacturing, fabricating, food processing, chemical processing, and plant operation; and (8) transportation and logistics. *See* N.J. STAT. ANN. § 34:8D-2.

- **Transportation:** Among other requirements, temporary staffing agencies and third-party clients are barred from charging temporary workers fees for transportation to and from a worksite, must provide transportation back to the point of hire if the worker has been transported to a worksite, and vehicles used to transport workers must be properly insured, be driven by properly-licensed drivers, and must have a seat and seat belt for every passenger. § 34:8D-5.

- **Pay Statements:** Among other requirements, temporary staffing agencies must "provide a temporary laborer certain information at the time of payment of wages. The same Section requires that the third-party client, at the end of the work day, provide the temporary laborer a verification form with required information, including the . . . worker's name, work location, and hours worked. Failure to comply carries a civil penalty for each violation." (Plas.' Br., ECF No. 1-2 at 7 (summarizing § 34:8D-6)). In addition, staffing agencies are prohibited from withholding or diverting wages except as authorized by the statute, and third-party clients are required to reimburse the agency for firm the wages and related payroll taxes by a temporary laborer in accordance with payment hours outlined in invoices, service agreements or stated terms. §§ 34:8D-6(b), (h).

- **Pay:** Temporary workers may not "be paid less than the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third-party client performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions for the third-party client at the time the temporary laborer is assigned to work at the third-party client." § 34:8D-7(b). The Act also restricts the amount a temporary staffing agency may charge a third-party client that permanently hires a temporary worker as a placement fee and imposes a $5,000 penalty for each violation of the Section. §§ 34:8D-7(a), (c); Third-party clients may also be held jointly and severally liable for such violations. § 34:8D-7(d).

- **Anti-Retaliation:** Temporary staffing agencies and their third-party clients or their agents are prohibited from taking retaliatory employment action against a covered worker who exercises his or her rights under the Act. *See* § 34:8D-10.

- **Private Cause of Action:** Aggrieved workers and temporary staffing agencies aggrieved by third-party clients may bring actions under the Act in New Jersey courts, and can seek relief including damages, attorney's costs and fees and, "in the case of unlawful retaliation, the greater of all legal or equitable relief as may be appropriate or liquidated damages equal to $20,000 per incident of retaliation." § 34:8D-11.

Defendants New Jersey Division of Consumer Affairs and Department of Labor & Workforce

Development have both been tasked with the implementation and enforcement of different

provisions of the Act. *E.g.*, §§ 34:8D-5(d), 34:8D-8. Both agencies have posted guidance documents regarding the Act's enforcement on their websites, (Decl. of Robert Asaro-Angelo, ECF No. 18-1 at ¶¶ 3–4; Decl. of Cari Fais, ECF No. 18-2 at ¶¶ 3–4), and they recently published a Notice of Proposal regarding proposed regulations to clarify and implement the Act. Temporary Laborers (proposed July 21, 2023) (to be codified at N.J. ADMIN. CODE § 12:72-1.1, *et seq.*), https://www.nj.gov/labor/research-info/legalnotices.shtml. The Act's disclosure and anti-retaliation provisions became effective on May 7, 2023. §§ 34:8D-3; 34:8D-10. The balance of the Act will become effective on August 5, 2023. § 34:8D-1, *et seq.*

### B.  Effects on the Industry

Plaintiffs contend that upon the remainder of the Act—and particularly the pay provision, § 34:8D-7—becoming effective, the temporary staffing industry in New Jersey will be brought "to a halt." (Plas.' Br., ECF No. 1-2 at 11). To support this contention, the have submitted several sworn declarations from representatives of their members describing the alleged calamity to come. (ECF Nos. 19-1–19-5; ECF Nos. 23-1–23-6).

In general, these business leaders explain that they "are hearing [their] customers frequently voicing concerns regarding the lack of clarity within the [Act] as it pertains to pay provisions, equal benefits, etc. as well as the risk of joint and several liability." (ECF No. 23-3, ¶ 3; ECF No. 19-5, ¶ 2; ECF No. 23-4, ¶ 2; ECF No. 23-5, ¶ 6). Because of these concerns, many have seen clients cancel the staffing agencies' services, communicate their intent to "phase out" the agencies' services, or simply hire temporary workers to nominally permanent positions but with the intent to terminate them as soon as they are no longer needed. (ECF No. 23-3, ¶ 3). Others are leaving the State of New Jersey entirely. (ECF No. 19-1, ¶ 3; ECF No. 19-2, ¶ 3; ECF No. 19-5, ¶ 3; ECF No. 23-3, ¶ 3; ECF No. 23-4, ¶¶ 3–6).

Staffing agencies have expressed their own concerns with respect to the Act's information disclosure provisions and claim that they will lead to the disclosure of "various trade secrets." (ECF No. 23-3, ¶ 4; ECF No. 19-2, ¶ 2). The agencies report they have lost or anticipate losing hundreds of thousands to millions in annual revenue due their clients' response to the Act. (ECF Nos. 23-1–23-6). Several expect these losses will force them to cease operations. (ECF No. 19-5, ¶ 3; ECF No. 23-2, ¶ 5; ECF No. 23-5, ¶¶ 4–5; ECF No. 23-6, ¶ 3).

In light of the foregoing, Plaintiffs filed suit. (Compl., ECF No. 1).

## II.   <u>PROCEDURAL HISTORY</u>

Plaintiffs initiated this action on May 5, 2023, with the filing of their Complaint and Application for an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, asserting claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J. STAT. ANN. § 10:6-2, *et seq.*, for violations of certain federal and state constitutional rights. (ECF No. 1). Specifically, Plaintiffs' Complaint comprises seven counts: (i) violation of the "dormant" Commerce Clause, U.S. CONST., art. I, § 8, cl. 3; (ii) violation of due process through statutory vagueness under the U.S. and New Jersey Constitutions, U.S. CONST., amend. XIV, § 1; N.J. CONST., art. I, ¶ 1; (iii) violation of due process through the unreasonable exercise of the police power under the U.S. and New Jersey Constitutions, U.S. CONST., amend. XIV, § 1; N.J. CONST., art. I, ¶ 1; (iv) violation of the right to equal protection under the U.S. and New Jersey Constitutions, U.S. CONST., amend. XIV, § 1; N.J. CONST., art. I, ¶ 1; (v) violation of the Privileges and Immunities Clause, U.S. CONST., art. IV, § 2;[3] (vi) violation of § 1983; and (vii) violation of

---

[3]   Count V of Plaintiff's Complaint purports to assert a claim under the "Privileges and Immunities Clause," but cites Section 2 of the Fourteenth Amendment—also known as the Privileges *or* Immunities Clause—as the source of the claim. (ECF No. 1, ¶¶ 91–93). The Privileges *and* Immunities Clause, meanwhile, can be found in Section 2 of Article IV of the Constitution. However, because the Fourteenth Amendment's Privileges *or* Immunities Clause has

the New Jersey Civil Rights Act.

The Court ordered Defendants to show cause why a temporary restraining order and preliminary injunction should not issue on May 8, 2023. (ECF No. 10). Defendants filed their opposition, (ECF No. 18), to which Plaintiffs replied, (ECF No. 19).

The Court heard oral argument pursuant to Local Rule 78.1 on June 13, 2023. (Hr'g Tr., ECF No. 24). At that hearing the Court granted leave for Plaintiffs to file supplemental briefing limited to the issue of irreparable harm, which Plaintiffs submitted on June 16, 2023. (ECF No. 23). Defendants responded on June 21, 2023. (ECF No. 26).

The Court later scheduled and held a status conference with the parties to explore settlement of this matter. (ECF Nos. 25, 27). Unfortunately, no settlement materialized, and the Court again ordered supplemental briefing limited to certain issues discussed at the conference. (ECF No. 28). Plaintiffs filed their second supplemental brief on July 3, 2023, (ECF No. 29), to which Defendants responded, (ECF No. 30), and Plaintiffs replied in further support, (ECF No. 31).

On July 21, 2023, Defendants notified the Court of the publication of a Notice of Proposal regarding newly-proposed regulations published by the New Jersey Department of Labor & Workforce Development, Division of Wage and Hour Compliance, to clarify and implement the Act. (ECF No. 32). Plaintiffs responded to this Letter on July 24, 2023. (ECF No. 33).

---

been interpreted to protect only a very narrow set of rights since the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873)—none of which appear relevant here, *see McDonald v. City of Chicago*, 561 U.S. 742, 754–57 (2010)—the Court presumes that Plaintiffs intend to rely on the "and" Clause in Article IV, and analyzes their claims accordingly.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers courts to grant temporary and preliminary injunctive relief when warranted. FED. R. CIV. P. 65. "[I]njunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). To obtain a temporary restraining order or preliminary injunction under the Rule, a movant must show—

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant [temporary or preliminary relief], should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 174 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transam. Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)); *Zaslow v. Coleman*, 103 F. Supp. 3d 657, 662 (E.D. Pa. 2015) ("The standard for granting a temporary restraining order under Federal Rule of Civil Procedure 65 is the same as that for issuing a preliminary injunction."). Of these factors, the first two are "most critical," and a movant's failure to establish either at the "gateway" requires the denial of the requested relief. *Reilly*, 858 F.3d at 179 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

### IV.   DISCUSSION

Plaintiffs seek emergency injunctive relief preventing Defendants from enforcing the provisions of the recently-enacted Temporary Workers' Bill of Rights, N.J. STAT. ANN. § 34:8D-1, *et seq*. (ECF No. 1) scheduled to take effect on August 5, 2023. Specifically, Plaintiffs assert claims under § 1983 and the New Jersey Civil Rights Act, arguing that various provisions of the Act violate the so-called "dormant" Commerce Clause, the Due Process and Equal Protection Clauses and their state constitutional analogues, and the Privileges & Immunities Clause. (ECF

No. 1-2). They contend that they are likely to succeed in litigating these claims and that their members[4] will be irreparably harmed if they are not granted emergency relief. (ECF No. 1-2). For the reasons that follow, the Court concludes that, although Plaintiffs have made the necessary showing with respect to irreparable harm, they have failed to show a likelihood of success on the merits of any of their claims, and their application for emergency injunctive relief must therefore be denied.

### A. Plaintiffs Have Made the Necessary Showing with Respect to Irreparable Harm.

Plaintiffs argue that their members have been and will be further irreparably harmed if the Act is allowed to go into effect in its entirety because (i) "[a] constitutional violation is enough to establish irreparable harm"; and (ii) their members have sustained "substantial [economic] losses" caused by the Act that cannot be recovered as damages because of Defendants' immunity and that will be so significant as to threaten the existence of the members' businesses. (Plas.' Supp. Br., ECF No. 23). Although the Court is dubious of Plaintiffs' first argument, it agrees with the second and concludes that they have made the necessary irreparable harm showing.

First, the Court is not convinced that, even if Plaintiffs could show that Defendants' enforcement of the Act would result in constitutional injury—and, as discussed below, they cannot, *see infra* Section IV.B—that such an injury necessarily establishes irreparable harm to justify a grant of emergency injunctive relief. *Contra Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders*, 893 F. Supp. 301, 309 (D.N.J. 1995) ("[A] violation of rights under the Dormant Commerce Clause constitutes the 'irreparable harm' necessary for a plaintiff to avoid denial of a

---

[4] After initially challenging Plaintiffs' standing to bring this suit, (Defs.' Br., ECF No. 18 at 13–18), Defendants later conceded at oral argument that Plaintiffs have associational standing to litigate this on behalf of their members, (ECF No. 24 at 14:7–13). Plaintiffs therefore assert that their members—various business involved in the temporary staffing industry and their partners— will be harmed by the Act in violation of their constitutional and statutory rights.

preliminary injunction on that ground only."). The Third Circuit has effectively said as much previously: "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). And subsequent cases, such as the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), cast further doubt on the premise that a purely legal injury is the type of harm that could support injunctive relief (or even Article III standing, for that matter). *Cf. id.* at 2214. But the Court need not settle this question conclusively because it accepts Plaintiffs' alternate arguments regarding Defendants' immunity and the threat to the existence of Plaintiffs' members businesses. (Plas.' Supp. Br., ECF No. 23 at 2–3).

Turning to those arguments, "[t]he irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000). Crucially, for the risk of harm to be sufficiently significant, it must be "more likely than not [to occur] in the absence of preliminary relief." *Reilly*, 858 F.3d at 179.

Typically, "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011) (quoting *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)). However, "in instances where the injured parties cannot recover monetary damages after the fact, even purely economic harm is considered irreparable." *ITServe All., Inc. v. Scalia*, No. 20-14604, 2020 WL 7074391, at *9 (D.N.J. Dec. 3, 2020) (citing *California v. Azar*, 911 F.3d 558, 579–80 (9th Cir. 2018)). For example, when a movant "will suffer at least some harm that cannot be compensated through an award of money damages" because the party responsible for that harm is protected by certain immunities, the movant has satisfied the irreparable harm requirement for

injunctive relief. *See Cigar Ass'n of Am. v. City of Phila.*, 500 F. Supp. 3d 428, 436 (E.D. Pa. 2020) (citing *Temple Univ. v. White*, 941 F.2d 201, 214 (3d Cir. 1991)), *aff'd*, No. 20-03519, 2021 WL 5505406 (3d Cir. Nov. 24, 2021). Moreover, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Minard Run*, 670 F.3d at 255 (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)).

Here, in addition to injunctive relief, Plaintiffs seek damages under § 1983 and the New Jersey Civil Rights Act against all Defendants. (Compl., ECF No. 1). Indeed, Plaintiffs suggest that their members will experience "tremendous financial losses" if the Act is allowed to go into effect. (Plas.' Supp. Br., ECF No. 23 at 3). In support of this assertion, Plaintiffs have submitted declarations from business leaders among their membership that the Act could cause the leaders' temporary staffing businesses to lose hundreds of thousands to millions of dollars in revenue. (Supp. Decls., ECF Nos. 23-1–23-6). For example, one leader explains that many of her top clients have advised that they will cancel her staffing business's services because "they do not understand [the Act's] pay and benefits provisions, cannot make the calculations and refuse to place their companies at risk for joint and several liability." (Supp. Decl. of Polly McDonald, ECF No. 23-5, ¶ 4). She explains that losing these clients alone will cost her business nearly $10 million, or fifty-one percent of the business's gross revenue, and that the business "will not be able to continue operations with such a precipitous drop." (ECF No. 23-5, ¶¶ 4–5). Statements like these from this leader and others demonstrate the likelihood that at least some subset of Plaintiffs' members will be forced out of business if the Act goes into effect. (ECF No. 19-5, ¶ 3; ECF No. 23-2, ¶ 5; ECF No. 23-5, ¶¶ 4–5; ECF No. 23-6, ¶ 3).

Despite these significant alleged harms, the parties appear to agree that, at least as to Defendants State of New Jersey, New Jersey Division of Consumer Affairs and New Jersey

12

Department of Labor & Workforce Development, Plaintiffs would not be able to recover damages because those Defendants are immune under the Eleventh Amendment.[5] And although the sovereign immunity doctrine does not protect Defendants Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs, or  Robert Asaro-Angelo, Commissioner of Labor & Workforce Development, from liability for damages in their individual capacities, Defendants have already foreshadowed that they will raise a *qualified* immunity defense, (ECF No. 18 at 13 n.5), that the Court views as likely to succeed based upon the allegations of the Complaint. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 738 (2011). So, because Plaintiffs have shown that their members "will suffer at least some harm that cannot be compensated through an award of money damages" because of Defendants' likely Eleventh Amendment and qualified immunities, they have sufficiently demonstrated irreparable harm justifying injunctive relief.[6]

Even if a damages award were not foreclosed by these immunities, however, the Court would still find that Plaintiffs have sufficiently demonstrated the likelihood of their members suffering irreparable harm under *Minard Run*. 670 F.3d at 255. In that case, the Third Circuit

---

[5]  Plaintiffs' counsel explicitly conceded their claims as to the State at the Court's June 13 preliminary injunction hearing. (Hr'g Tr., ECF No. 24 at 10:17–22). And although counsel was not willing to do the same with respect to the agencies, (ECF No. 24 at 12:1–21), Plaintiffs' subsequent briefing acknowledged as much, arguing that "Because Defendants Have Immunity From Monetary Damages, Plaintiffs' Economic Losses Constitute Irreparable Harm." (ECF No. 23 at 2).

[6]  The Court admits some skepticism as to the "the exact *magnitude* of damage" that Plaintiffs will suffer, but notes that this skepticism does discount Plaintiffs' showing of irreparable injury. *Cigar Ass'n*, 500 F. Supp. 3d at 437. This skepticism arises because the Court provided Plaintiffs specific instructions regarding the type of data it was interested in reviewing to best understand the extent of the damages their members anticipated suffering, (ECF No. 24 at 48–51, 99), but Plaintiffs failed to provide that data in their supplemental submissions, (ECF No. 23). All the same, the Court recognizes that the relevant question is not the magnitude, but the likelihood of these damages, and regardless of their precise extent, Plaintiffs' declarations establish that at least some will be unrecoverable. *Cigar Ass'n*, 500 F. Supp. 3d at 437. As such, the Court is satisfied that Plaintiffs have shown a likelihood of some irreparable harm justifying injunctive relief.

affirmed a district court's finding of irreparable harm after "credit[ing] the testimony of several business owners that the [regulation at issue] had dramatically affected their business and would probably cause them to shut down or go bankrupt if it continued." *Id.* Here, Plaintiffs have identified and supplied sworn declarations from several of their members who anticipate going out of business if the Act is allowed to go into effect: Gerald M. Cerza of United Temporary Services, Inc., (ECF No. 23-2, ¶ 5); Polly McDonald of TeleSearch Staffing Solutions, (ECF No. 23-5, ¶¶ 4–5); and Juan Carlos Diaz of ProStaff Workforce Solutions, (ECF No. 23-6, ¶ 3). These business leaders cite specific revenue projection figures and communications with top customers to attribute the loss of their businesses to the Act. (ECF No. 23-2, ¶ 5; ECF No. 23-5, ¶¶ 4–5; ECF No. 23-6, ¶ 3). And beyond these three, it is fair to extrapolate that other industry members will similarly have "to make difficult choices." (Decl. of Edward H. Damm, ECF No. 23-3, ¶ 3).[7] Because Plaintiffs have demonstrated through these declarations that several of its members' businesses are likely to be dramatically affected and even shut down because of the Act,[8] they have met the necessary showing of irreparable harm. *Minard Run*, 670 F.3d at 255.[9]

---

[7] To be clear, the Court does not simply *infer* that more of Plaintiffs' members might be forced out of business because of the Act; rather, it views Mr. Damm's declaration, (ECF No. 23-3), as affirmative evidence that other businesses among Plaintiffs' members who are similarly situated to those cited above are at substantial risk of going out of business, and thus experiencing irreparable harm. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485–86 (3d Cir. 2000).

[8] The fact that the likely economic losses at issue here are substantial enough to drive these companies out of business is what differentiates them from the ordinary compliance costs that are typically insufficient to constitute irreparable harm. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) (explaining that compliance costs must amount to "peculiar" injury to constitute irreparable harm and suggesting that compliance costs "so great vis a vis the corporate budget that significant changes in a company's operations would be necessitated" would be sufficient).

[9] Defendants noted at oral argument that "because [*Minard Run*] involved drilling rights and the interests involved real property, it was of a special kind of peculiar and specific nature of harm that could not be addressed or remedied later." (ECF No. 24 at 61:3–6). To be sure, they are right: the real property rights at issue in *Minard Run* provided significant support to the Third Circuit's holding that the district court properly found irreparable harm. 670 F.3d at 256. However, although *significant*, that support was not factually or legally *necessary* to the court's conclusion. The

In sum, because Plaintiffs have adequately shown that their members are likely to face economic losses that could threaten the existence of the members' businesses[10] and because those losses are likely unrecoverable from Defendants because of their sovereign and qualified immunities, they have made the necessary showing of irreparable harm to justify temporary and preliminary injunctive relief.[11] Nevertheless, because they are not likely to succeed on the merits of their claims, their application must be denied.

### B. Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

Regardless of any harms the Act might cause Plaintiffs' members, Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of any of their claims, and their request

---

court's discussion of the real property interests at issue provided "[a]dditional[]" support to its finding of irreparable harm, which was independently and sufficiently grounded in its discussion of substantial economic loss. *Id.* at 255–56 ("[T]he moratorium *also* causes irreparable injury to mineral rights owners by depriving them of the unique oil and gas extraction opportunities afforded them by their mineral rights." (emphasis added)).

[10]  The significance of this statement is not lost on the Court: it is likely that many New Jersey temporary staffing agencies will go out of business because of this Act. As the Court will explain, that does not render the Act unconstitutional. *See infra* Section IV.B. And, to be clear, the Court does not mean to second-guess the State's policy judgments; the State might have reasonably concluded that this was a necessary cost for protecting temporary workers on the whole. But given these costs, the Court would have expected more caution from the State. Defendants' unwillingness to consider even a brief non-enforcement agreement, particularly as it relates to the pay provision, during the notice-and-comment period for their recently proposed regulations—issued on the eve of the Act taking effect—so that all involved parties and stakeholders could fairly assess and plan for the Act's implementation is disappointing given the tremendous changes that are about to occur. Temporary Laborers (proposed July 21, 2023) (to be codified at N.J. ADMIN. CODE § 12:72-1.1, *et seq.*), https://www.nj.gov/labor/research-info/legalnotices.shtml.

[11]  The Court must acknowledge an important caveat to this finding. As Defendants rightly argue, irreparable harm requires "a claim-specific analysis," *e.g.*, *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 387 (E.D.N.Y. 2021), and Plaintiffs must demonstrate that the irreparable harm that their members will suffer actually flow from Defendants' alleged constitutional and statutory violations. (Defs.' Supp. Br., ECF No. 26 at 2–3). But as the Court will explain, Plaintiffs are not likely to be able to prove any such constitutional and statutory violations. *See infra* Section IV.B. So, although the Court finds that Plaintiffs have shown the likelihood of irreparable harm from the Act, because the Act is likely consistent with Constitution, that harm does not flow from any violation of Plaintiffs' constitutional rights and cannot on its own cannot support injunctive relief.

for injunctive relief must therefore be denied.

To begin, as discussed above, the parties appear to agree that Plaintiffs' claims against the State of New Jersey and its agencies—Defendants New Jersey Division of Consumer Affairs and New Jersey Department of Labor & Workforce Development—are barred by the doctrine of sovereign immunity. *See supra* Section IV.A. Moreover, as Defendants rightly argue, (ECF No. 18 at 12), *all* of Plaintiffs' state-law claims, regardless of the Defendant against whom they are asserted, are also barred by sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984) ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment."). Thus, as the Court explained at oral argument, (ECF No. 24 at 12:10–21), Plaintiffs' only viable claims are those against Defendants Fais and Asaro-Angelo under § 1983, asserting violations of the U.S. Constitution.[12]

As to those claims, Plaintiffs argue that certain provisions of the Act violate (i) the "dormant" Commerce Clause; (ii) the Due Process Clause; (iii) the Equal Protection Clause; and (iv) the Privileges & Immunities Clause. For the reasons that follow, however, the Court concludes that Plaintiffs are unlikely to succeed on any of these constitutional claims, and thus, their application for injunctive relief must be denied.

1. The Dormant Commerce Clause

Plaintiffs' main argument against the Act's constitutionality—that it violates the so-called "dormant" Commerce Clause—is foreclosed by the Supreme Court's recent decision in *National Pork Producers Council v. Ross*, 598 U.S. __, 143 S. Ct. 1142 (2023), which offered a major

---

[12] Because § 1983 only imposes liability upon those who deprive persons of *federal* constitutional or statutory rights, Plaintiffs' allegations that the Act violates the New Jersey Constitution cannot support their § 1983 claims. *See, e.g.*, *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005).

update to its Dormant Commerce Clause jurisprudence and rendered Plaintiffs' primary theory no longer viable.

The Dormant Commerce Clause doctrine has developed gradually through cases dating back to the early nineteenth century, *id.* at 1152 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824)), and generally stands for the proposition that "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject,'" *id.* Although it has taken many forms over the past 200 years, the doctrine has always aimed to preserve a prohibition on the "enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (internal quotations and alterations omitted) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)). Rooting out this state-based discrimination has always been the goal.

Despite this goal, for many years, one avenue for Dormant Commerce Clause plaintiffs to plead a claim had been to argue that a challenged law's extraterritorial *effects* amounted to direct regulation of interstate commerce in violation of the Clause's exclusive grant of congressional authority. *See, e.g.*, *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 237–38 (3d Cir. 2022). However, the *National Pork* Court has rendered the "extraterritoriality doctrine" a dead letter: extraterritorial effects alone are no longer sufficient to show a violation of the Commerce Clause. 143 S. Ct. at 1153–57; *id.* at 1167 (Roberts, C.J., concurring in part and dissenting in part) ("[O]ur precedent does not support a *per se* rule against state laws with 'extraterritorial' effects."). Instead, plaintiffs now must demonstrate that a law amounts to "purposeful discrimination against out-of-state businesses." *See id.* at 1158–59.

Plaintiffs filed their Complaint just a week prior to the *National Pork* decision. Nevertheless, Plaintiffs have not alleged either at argument or in their supplemental briefing—at least not coherently[13]—purposeful discrimination against out-of-state businesses, all but dooming their claims.

Perhaps seeing the writing on the wall, Plaintiffs instead shifted their arguments to rely more heavily on three cases that clearly survived the *National Pork* revolution: *Healy v. Beer Institute*, 491 U.S. 324 (1989), *Brown-Forman Distillers Corporation v. New York State Liquor Authority*, 476 U.S. 573 (1986), and *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935). (Plas.' Reply, ECF No. 19 at 8–9; Hr'g Tr., ECF No. 24 at 29:31–30:24). However, none of these cases can save their claims.

In *Healy*, the Court reviewed a Connecticut law that required out-of-state beer merchants to affirm that their Connecticut prices were no higher than those they charged in neighboring states. 491 U.S. at 328–330. In effect, Connecticut imposed a most-favored-nation clause on all out-of-state beer distributors—indeed, explicitly applying the law only to them—to ensure that they could not attempt to undercut Connecticut distributors' prices. *See National Pork*, 143 S. Ct. at 1154–55 (quoting *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 391–92 (1994)). The Court easily struck down the plainly protectionist statute.

---

[13]  At oral argument, Plaintiffs' counsel attempted to argue—as best as the Court understands it—that out-of-state businesses are treated differently than New Jersey businesses under the Act because out-of-state businesses who hire New Jersey temporary workers are required to furnish certain information to the workers under the Act's disclosure provisions. (ECF No. 24 at 34:5–36:22). But of course, New Jersey businesses are required to do the same. *See* N.J. STAT. ANN. § 34:8D-6. Indeed, every single burden imposed by the Act upon out-of-state businesses is likewise imposed upon New Jersey businesses. The Act does not discriminate. Counsel's argument appears to be a retreading of the extraterritorial effects theory that the *National Pork* Court rejected. 143 S. Ct. at 1153–57. Plaintiffs' members from outside New Jersey might not like having to comply with the Act—which undoubtedly is burdensome—when hiring New Jersey workers, but those requirements do not offend the Commerce Clause.

*Brown-Forman* involved a similar New York law that required liquor distillers to affirm on a monthly basis that their in-state prices were no higher than their out-of-state prices. 476 U.S. at 576. Again, the law "sought to force out-of-state distillers to 'surrender' whatever cost advantages they enjoyed against their in-state rivals." *National Pork*, 143 S. Ct. at 1154 (quoting *Brown-Forman*, 476 U.S. at 580). The Court once again struck down the law as plainly protectionist. *Id.*

Finally, in *Baldwin*, the Court analyzed another New York law "that barred out-of-state dairy farmers from selling their milk in the State 'unless the price paid to' them matched the minimum price New York law guaranteed in-state producers." *National Pork*, 143 S. Ct. at 1154 (quoting *Baldwin*, 294 U.S. at 519). This, of course, was even more brazenly protectionist: it allowed New York milk producers to set the minimum price of milk at the expense of out-of-state producers, "erecting an economic barrier protecting a major local industry against competition from without the State." *Id.* (quoting *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951)). Again, the Court said no. *Baldwin*, 294 U.S. at 519.

The Act here is nothing like those Connecticut or New York laws. Plaintiffs argue that the law is aimed at forcing out-of-state businesses to pay New Jersey temporary workers more than their out-of-state counterparts. (ECF No. 24 at 29:21–30:24).[14]  This argument fails for multiple reasons. To begin, unlike the laws at issue in *Healy* and *Baldwin*, the Act applies equally to New Jersey and out-of-state businesses, so out-of-state businesses are in no way disadvantaged as compared to their New Jersey competitors. § 34:8D-1, *et seq.* Furthermore, every burden imposed

---

[14] To be clear, to the extent Plaintiffs attempt to argue that the Act disadvantages out-of-state temporary *workers* for the benefit of their New Jersey counterparts, Plaintiffs lack standing to raise such an argument. Plaintiffs represent temporary staffing *agencies*, not temporary workers. Their associational standing does not extend so far. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009).

upon out-of-state businesses is likewise imposed on New Jersey businesses. There is simply nothing discriminatory about the Act. In fact, out-of-state staffing agencies are in some sense *advantaged* over New Jersey businesses: a Pennsylvania staffing agency seeking to place temporary workers at a Philadelphia business, for example, needs only to abide by Pennsylvania law, whereas a New Jersey agency seeking to do the same must abide by the Act, meaning the Pennsylvania agency can likely offer lower labor costs and fewer regulatory requirements than their New Jersey competitor. *See id.* Such a law could hardly be described as protectionist.

 Plaintiffs' final argument—that the Act should be struck down under the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), balancing test—also fails. "*Pike* provides that nondiscriminatory state regulations are valid under the Commerce Clause 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *National Pork*, 143 S. Ct. at 1167 (Roberts, C.J., concurring in part and dissenting in part). In other words, in a case of a nondiscriminatory statute—which the Act undisputedly is, (Plas.' Reply, ECF No. 19 at 8)—a plaintiff can still state a Dormant Commerce Clause claim when the statute's nondiscriminatory "burdens clearly outweigh the benefits of a state or local practice." *Dep't of Revenue of Ky.*, 553 U.S. at 353. Plaintiffs cannot show as much here.

Notably, only a "a small number" of cases "have invalidated state laws . . . that appear to have been genuinely nondiscriminatory" in nature under *Pike*. *National Pork*, 143 S. Ct. at 1166 (Sotomayor, J., concurring in part). "Often, such cases have addressed state laws that impose burdens on the arteries of commerce, on trucks, trains, and the like[, and] claims that do not allege discrimination or a burden on an artery of commerce are further from *Pike*'s core." *Id.* (quotation omitted); *but see id.* at 1168 (Roberts, C.J., concurring in part and dissenting in part) ("As a majority of the Court agrees, *Pike* extends beyond laws either concerning discrimination or

governing interstate transportation."). Plaintiffs' claims fall far from that core.

Although the Act admittedly imposes some burdens on interstate commerce, Plaintiffs have not and cannot show that those burdens are substantial. The Act's most significant impacts fall on New Jersey staffing agencies, who must comply with Act regardless of where they do business. § 34:8D-1, *et seq.* That said, the Act will undoubtedly reach out-of-state businesses seeking to hire New Jersey temporary workers. *Id.* But Plaintiffs have not shown the extent of these effects. And even if they did, the Supreme Court has held that regulations that impose wholesale change on market's structure do not impermissibly burden commerce. *See Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127 (1978). Regardless, Plaintiffs have not shown how any of these burdens on interstate commerce could outweigh the State's admittedly legitimate interest in protecting workers. *See, e.g.*, *Businesses for a Better N.Y. v. Angello*, 341 F. App'x 701, 705 (2d Cir. 2009). The *Pike* balancing test, therefore, cannot support Plaintiffs' claims either.

In sum, Plaintiffs have not demonstrated a likelihood of success on the merits of their Dormant Commerce Clause claim under either the traditional doctrine or *Pike* balancing and thus fail to justify the issuance of emergency injunctive relief.

### 2. The Due Process Clause

Plaintiffs also argue that the Act violates the Due Process Clause under two separate theories: first, the Act is void under the Clause because it is unconstitutionally vague; and second, the Act constitutes an unreasonable exercise of the State's police power. Neither theory is availing.

**Void for Vagueness.** Unlike Plaintiffs other claims, which challenge the Act in its entirety, Plaintiffs specifically target Section 7 of the Act, N.J. STAT. ANN. § 34:8D-7, for purposes of their void-for-vagueness claims. (Compl., ECF No. 1, ¶¶ 72–76). Section 7, the so-called "pay provision," (a) restricts the amount a temporary staffing agency may charge a client that permanently hires a temporary worker as a placement fee, § 34:8D-7(a); and (b), perhaps most

21

controversially, provides that—

> [a]ny temporary laborer assigned to work at a third party client in a designated classification placement shall not be paid less than the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third party client performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions for the third party client at the time the temporary laborer is assigned to work at the third party client,

§ 34:8D-7(b).  The Act imposes a $5,000 penalty for each violation of the Section and holds third-party clients jointly and severally liable for such violations. §§ 34:8D-7(c)–(d). Plaintiffs argue that Subsection (b) in particular, and Subsection (a) in relation to Subsection (b),[15] are unconstitutionally vague on their face and therefore void because they offer no guidance as to how to calculate the required wages to be paid and benefits to be provided. (Plas.' Br., ECF No. 1-2 at 21–23). Although these provisions of the Act are not a picture of clarity, they are not so lacking as to be deemed unconstitutionally vague on their face.

Plaintiffs bear a weighty burden in attempting to prove that Section 7 is void for vagueness. A law is unconstitutionally vague under the Due Process Clause only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Although more typically applied in the criminal context, the doctrine extends to civil enforcement as well. *E.g.*, *Dailey v. City of Phila.*, 417 F. Supp. 3d 597, 616 (E.D. Pa. 2019), *aff'd*, 819 F. App'x 71 (3d Cir. 2020). In the civil enforcement context, the test for vagueness is "especially lax": to be unconstitutionally vague, a civil statute that regulates economic activities must be "so vague as to be no rule or standard at all." *FTC v. Wyndham Worldwide Corp.*, 799

---

[15]  Plaintiffs argue that because the placement fee cap imposed by Subsection (a) depends on the amount of wages paid to the temporary employee, Subsection (b)'s requirements with respect to wages infect Subsection (a) with the same unconstitutional vagueness. (Plas.' Br., ECF No. 1-2 at 23 n.1).

F.3d 236, 250 (3d Cir. 2015) (quoting *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631–32 (3d Cir. 2013)). Applying this standard, a plaintiff must show that "the law is impermissibly vague in all of its applications." *CMR*, 703 F.3d at 631–32. Plaintiffs cannot do so here.

In their briefing and at oral argument, Plaintiffs raised questions about how the proper pay and benefits were to be calculated under Section 7 and, specifically, whether certain factors are required to be considered when performing the calculation. Should employers consider length of service? Time of work—as in nights and weekends? Merit? Quality or quantity of production? Workplace location? Travel? Education? Training or experience? (Plas.' Reply, ECF No. 19 at 1– 2). However, by raising these questions, Plaintiffs have given away the game: they are tacitly admitting that they know *exactly* the sort of relevant factors that ought to be considered in identifying a proper comparator-employee for the calculation of pay and benefits under the Act. To be sure, Section 7 does not tell Plaintiffs explicitly which factors are most important or how they should be weighed. § 34:8D-7(b). But that is not required for the Act to survive a void-for-vagueness challenge. *CMR*, 703 F.3d at 631–32 ("That [a law] may contain some ambiguities does not render it impermissibly vague.").

That Plaintiffs have been able to identify (at least some) of the relevant factors necessary for identifying comparator-employees is no surprise; they are sophisticated commercial actors who engage in this sort of practice all the time. Indeed, all sorts of federal and state employment laws require similar cross-employee comparisons: the federal Equal Pay Act, 29 U.S.C. § 206(d)(1), and New Jersey Law Against Discrimination as amended by the Diane B. Allen Equal Pay Act, N.J. STAT. ANN. § 10:5-12(t), serve as perfect examples. Case law interpreting these statutes and others is abundant, and Plaintiffs, their members, and their members' third-party partners have been abiding by these laws for decades. In short, although the application to temporary workers is

novel, they know how to do this.

Plaintiffs respond that the Act is different from those other employment statutes because the relevant information needed to conduct the necessary calculations belongs to their third-party partners, and those partners will refuse to provide it because they view the information as "proprietary." (Hr'g Tr., ECF No. 24 at 19:15–20:3). Setting aside the fact that this problem seems easily solved by the sort of confidentiality provisions routinely added to business contracts, really, the issue is a red herring. This burden, and the reticence of clients to provide this information might make compliance more difficult, but it does not make Section 7 unconstitutionally vague. *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 915 (3d Cir. 1990) ("Inability to satisfy a clear but demanding standard is different from inability in the first instance to determine what the standard is."). Plaintiffs know the information they need and from where it must be obtained, just not how to get it (or, at least, so they say).

As the foregoing demonstrates, Section 7 is not facially vague. Further undermining Plaintiffs' claims is the fact that, just days ago, Defendants issued a Notice of Proposal that published a series of proposed regulations to further clarify and implement the Act, including Section 7. *See* Temporary Laborers (proposed July 21, 2023) (to be codified at N.J. ADMIN. CODE § 12:72-1.1, *et seq.*), https://www.nj.gov/labor/research-info/legalnotices.shtml.[16] Subchapter 7 of the Notice provides fairly comprehensive instructions for the calculation of appropriate wages and benefits. §§ 12:72-1.1–7.3. And Plaintiffs are allowed—and, indeed, invited—to provide comments to clarify these proposed regulations further before they are finalized and promulgated.

---

[16] Plaintiffs have stated their intent to challenge these proposed regulations as *ultra vires*, (Plas.' Br., ECF No. 19 at 10; Hr'g Tr., ECF No. 24 at 38:25–39:10), but that question is not before the Court because, among other reasons, it lacks jurisdiction to decide it, *see Pennhurst*, 465 U.S. at 117. Regardless though, even if a New Jersey court were to strike down these regulations as invalid, Section 7 still would not be unconstitutionally vague on its face, as discussed above.

*Id.* Whatever questions Plaintiffs still might have, now is their chance to get the answers they need. Further, Defendants have represented that until the final adoption of the proposed regulations, they will not interpret nor enforce Section 7 in a contrary manner. Thus, Plaintiffs now have even more detailed guidance and certainty as to how the Defendants intend to interpret and enforce Section 7.

In response, Plaintiffs suggest that the proposed rules are "vague and impossible to decipher" and that the Act "is even less clear by this publication." (Plas.' Letter, ECF No. 33 at 2). Further, they argue that "it is *impossible* to summarize the placement fee calculations set forth at N.J.A.C. 12:72-6.2 because their complexity is *astounding* and also dependent upon the *impossible* determination of 'daily cost . . . of benefits provided to the temporary laborer.'" (ECF No. 33 at 2 (emphasis added)). These are undoubtedly the same arguments and claims that Plaintiffs made when lobbying before the Legislature against the Act's adoption. And in any event, their complaints are misplaced. It is not for *this Court* to determine whether the policies served by the Act are worthy of pursuit, or whether it is wise to impose the likely burdens to follow upon New Jersey businesses like Plaintiffs' members. *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995) (explaining that courts must not "second guess the legislature on the factual assumptions or policy considerations underlying the statute" and are "not authorized to determine . . . whether the desired goal has been served"). These were questions for the Legislature and are now for regulators. Plaintiffs should submit comments regarding whatever errors, inconsistencies, and so-called impossibilities they find so that they might be corrected or clarified.

In sum, Section 7 is not unconstitutionally vague on its face, and Plaintiffs now have the benefit of additional proposed regulations for greater clarity. Plaintiffs thus are not likely to succeed on the merits of their Due Process claim under this theory and cannot justify emergency injunctive relief.

**Unreasonable Exercise of the Police Power.** Although the State of New Jersey undoubtedly possesses broad police powers that "extend[] beyond health, morals and safety, and comprehend[] the duty, within constitutional limitations, to protect the well-being and tranquility of a community," *Kovacs v. Cooper*, 336 U.S. 77, 83 (1949), Plaintiffs argue the Act must be struck down as an "unreasonable" exercise of those powers under *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962). (Plas.' Br., ECF No. 1-2 at 24).[17]

The *Goldblatt* Court reaffirmed the nineteenth-century rule that "[t]o justify the state in interposing its authority in behalf of the public, it must appear—[f]irst, that the interests of the public require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." *Id.* at 594–95 (alterations omitted) (quoting *Lawton v. Steele*, 152 U.S. 133, 137 (1894)). But in the very next sentence, the Court added the caveat that "[e]ven this rule is not applied with strict precision, for this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the Legislature.'" *Id.* (alterations omitted) (quoting *Sproles v. Binford*, 286 U.S. 374, 388 (1932)). In effect, then, the *Goldblatt* Court explained that to comport with the Due Process Clause, acts of a state legislature must be able to survive what we now call rational basis review. *Compare id. with City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("The general rule is that legislation . . . will be sustained if [it is] rationally related to a legitimate state interest."). Under that standard, a statute must be upheld if "(1) there is a legitimate state interest that (2) could

---

[17] The Court notes that Plaintiffs' claims under this theory are unusual in that they do not involve any sort of zoning ordinance or other regulation of real property, which are seemingly always the basis for unreasonable-exercise-of-the-police-power claims. *E.g.*, *Hartman v. Township of Readington*, No. 02-02017, 2008 WL 2557544 (D.N.J. June 23, 2008). Despite not aligning with the usual factual predicate for these claims, the Court analyzes them consistent with those precedents all the same.

be rationally furthered by the statute." *E.g.*, *Mech. Contractors Ass'n of N.J., Inc. v. New Jersey*, 541 F. Supp. 3d 477, 493 (D.N.J. 2021) (quoting *N.J. Retail Merch. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 398 (3d Cir. 2012)). The Act easily meets both requirements.

The Act is—by its plain terms—"intended to further protect the labor and employment rights of [temporary] workers." N.J. STAT. ANN. § 34:8D-1(d). As Plaintiffs acknowledge, this a perfectly legitimate state interest. (Plas.' Reply, ECF No. 19 at 12). The Act—and particularly Section 7, which is the primary target of Plaintiffs' objections, (Plas. Br., ECF No. 1-2 at 23)— obviously furthers that interest. It seeks to provide temporary workers with greater transparency, fair pay, workplace safety, and heightened protection from retaliation. § 34:8D-1, *et seq*. Plaintiffs might not believe that the Act will accomplish those goals, or that it was wise for the State to prioritize the rights of temporary workers over those of New Jersey businesses, but that does not render it unconstitutional. *E.g.*, *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399 (1937) ("Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment.").

In reality, what Plaintiffs actually fear is that the Act will spell the demise of the temporary staffing industry in New Jersey. There is no doubt that the Act, and specifically Section 7, imposes substantial and costly burdens upon on that industry. However, another goal of the Act is to encourage employers to hire more *permanent* employees, rather than utilizing temporary workers. Although neither the text of the Act nor its legislative history expressly state such a goal, nor did Defendants confirm it as a goal at argument when questioned by the Court, (ECF No. 24 at 77– 12–17), the newly proposed regulations indeed identify the creation of more permanent employment jobs as an aim of the statute. Again, it is not the Court's role to evaluate the wisdom or potential effectiveness of the State's chosen course of policymaking; its task is solely to

determine whether "any reasonably conceivable state of facts . . . could provide a rational basis" for the State's action. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). This Act easily passes that test.

Because the Act readily survives rational basis review, it is not an unreasonable exercise of the police power under the Due Process Clause. Plaintiffs' claims are not likely to succeed under this theory and cannot justify emergency injunctive relief.

### 3. The Equal Protection Clause

Plaintiffs also suggest that "[i]n enacting the [Act], New Jersey has unfairly singled out the staffing industry," and thereby has violated the Equal Protection Clause. (Compl., ECF No. 1, ¶ 84).[18] Unfair or otherwise, however, Plaintiffs acknowledge—as they must, *e.g.*, *Mech. Contractors*, 541 F. Supp. 3d at 484–85—that, because the industry and its workers are not a suspect class, the Act again needs only to survive rational basis review to pass constitutional muster. (Plas.' Br., ECF No. 1-2 at 25–26). And, for precisely the same reasons discussed above with respect to Plaintiffs' police-power challenge, *see supra* Section IV.B.2, it does.

Plaintiffs' claims under the Equal Protection Clause are not likely to succeed and cannot justify injunctive relief here.

### 4. The Privileges or Immunities Clause

As Defendants rightly note in their Opposition, "Plaintiffs make no mention of Count Five, the Privileges and Immunities Clause claim, in their application for emergency relief." (ECF No. 18 at 32 n.11). This was likely for good reason: the Privileges & Immunities Clause "has been

---

[18]   The Court must note that Plaintiffs have at no point identified in what way their members have been subject to *discrimination* relative to some similarly-situated group—a necessary element of an Equal Protection claim. *E.g.*, *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005). Indeed, they have failed to even identify who that similarly-situated group might be. Regardless though, because the Act survives rational basis review, Plaintiffs' Equal Protection claim is not likely to succeed and cannot justify emergency injunctive relief.

interpreted not to protect corporations" like Plaintiffs' members. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460–61 (2019) (citing *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 656 (1981)). Indeed, Plaintiffs all but conceded the claims at oral argument. (Hr'g Tr., ECF No. 24 at 56:5–25). Because Plaintiffs' members plainly fall outside the scope of the Privileges & Immunities Clause's protection, their claims under the Clause are not likely to succeed, and thus cannot support the grant of emergency injunctive relief.

*****

Because the Court concludes that Plaintiffs have failed to show a likelihood of success on the merits of their claims—one of the two "most critical," "gateway" factors in the temporary and preliminary injunctive relief analysis, *Reilly*, 858 F.3d at 179 (quoting *Nken*, 556 U.S. at 434)— the Court need not reach and offers no opinion regarding the additional factors, potential harm to non-moving parties and the public interest. *See id.* at 174, 179 (noting that courts need only consider these additional factors "when they are relevant" and "[i]f the[] gateway factors are met").

**CONCLUSION**

For the foregoing reasons, Plaintiffs' application for emergency injunctive relief, (ECF No. 1), is **DENIED**. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**